IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARISE PARKER,

     *Plaintiff,*

     v.

CHILDREN'S NATIONAL MEDICAL
CENTER, INC.,

     *Defendant.*

Civil No. 1:20-cv-03523-JRR

## MEMORANDUM OPINION

This matter comes before the court on Defendant Children's National Medical Center, Inc.'s ("CNMC" or "Defendant") Motion for Summary Judgment. (ECF No. 63; the "Motion.") The court has reviewed all papers.[1] No hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, the Motion will be granted.

## I.   BACKGROUND

### A.   Undisputed Material Facts

#### 1.   *Plaintiff's Position and Performance*

From September 2018 through February 2019, Plaintiff was employed as a Training Specialist at Defendant's office in Silver Spring, Maryland. (Pl.'s Resp., Pl.'s Supp. Answers and Objections to Def.'s Interrog., Exhibit A, ECF No. 82-2, No. 15.) As a Training Specialist, Plaintiff was subject to a six-month Introductory Period Performance Evaluation. (Def.'s Mot.,

---

[1] On January 8, 2024, the court struck Plaintiff's Opposition at ECF No. 68 and allowed Plaintiff to resubmit a proper opposition in compliance with the Federal Rules of Civil Procedure and the Local Rules. (ECF No. 81.) On January 12, 2024, Plaintiff refiled her Opposition to the Motion. (ECF No. 82.) On January 23, 2024, Defendant filed a Reply. (ECF No. 86.)

Introductory Period Performance Policy, Exhibit D, ECF No. 63-6.)   The Introductory Period

Performance Evaluation Policy provides in relevant part:

> The introductory period provides an initial assessment period during which a new employee evaluates Children's National as his/her employer and Children's National evaluates the employee's ability to perform the job.
>
> A. The introductory period performance evaluation format is designed to review and rate job-related behaviors of the employee.
>
> B. The purpose of the introductory period performance evaluation is as follows:
>
> C. To advise the employee of his/her strengths and weaknesses and what is expected of him/her in the position.
>
> D. To assist the manager in determining the employee's potential for further advancement and development.
>
> E. To build and strengthen the manager/employee relationship.
>
> F. To determine whether the employee continues employment with Children's National.
>
> G. The immediate manager shall provide orientation and training to the employee to ensure that he/she has an opportunity to be successful in the job.
>
> H. The immediate manager shall make reasonable efforts to help new hires adapt to job requirements.
>
> I. If job performance is unacceptable during the initial or extended introductory period, the employee should be terminated.
>
> J. If performance is satisfactory by the end of the introductory period, the individual becomes eligible for regular employee status.
>
> K. Introductory period performance evaluations must be completed in TOWER (Employee Review System) in accordance with the due date.
>
> L. Extension of Introductory Period

> A one-time extension of the introductory period is permissible. If the immediate manager requires additional time to fairly and accurately evaluate the employee's performance, the manager, in consultation with the Human Resources Department, may extend the introductory period for thirty (30) calendar days. Notification of this decision and discussion with the employee must take place prior to the end of the introductory period.
>
> M. Transfers and Promotions
> All employees transferring into a new job at a higher level will be required to serve a ninety (90) calendar day introductory period if the new job is non-exempt, non-nursing or one hundred and eighty (180) calendar day introductory period if the new job is exempt or nursing. The need of a new introductory period for lateral transfers is at the discretion of the department and should be reflected in the departmental policies and procedures. Promotions and transfers are generally not allowed during the introductory period.

*Id.*

As a Training Specialist, Plaintiff's responsibilities included facilitating the education, orientation, and training for new hires and existing employees.  (Def.'s Mot., Itina Viaud Dep., Exhibit A, ECF No. 63-3 at 128:3-8.)  Throughout her employment, Plaintiff's supervisor was Itina Viaud.  (Def.'s Mot., Sharise Parker Dep., Exhibit C, ECF No. 63-5 at 41:19-22.)  Around November and December of 2018, Viaud began to have concerns with Plaintiff's job performance. (Viaud Dep. 190:8-18.)   Specifically, Viaud was concerned with Plaintiff's inability to meet deadlines and that her work "lacked attention to detail." *Id.* at 199:16-200:13.  From October 2018 through February 2019, Viaud provided numerous emails to Plaintiff regarding her work performance and specific assignments that needed improvement.  (*See* Def.'s Mot, Viaud Emails, Exhibit E, ECF No. 63-7.)  During that same time, Viaud also emailed Plaintiff commending her for certain work or project achievements and outcomes.  (*See* Pl.'s Resp., Viaud Emails Praising Parker Performance, Exhibit B, ECF No. 82-3.)

### 2.     *Plaintiff's Pregnancy and Accommodation Requests*

In November 2018, Plaintiff learned that she was pregnant and, around Thanksgiving time, informed Viaud of her pregnancy.  (Pl.'s Resp., Pl.'s Suppl. Answers to Def.'s Interrog., Exhibit A, ECF No. 82-2, No. 15.)  On December 2, 2018, Plaintiff started bleeding vaginally as a result of a uterine fibroid.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15; Parker Dep. 67:3-9.)  Plaintiff sought treatment at the emergency room fearing she may be having a miscarriage.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15.)  The emergency room recommended bed rest from December 3, 2018 through and including December 5, 2018.  *Id.*  The emergency room also provided Plaintiff with documentation indicating that she could return to work in three days.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15; Pl.'s Resp., Emailed ER Note to Viaud, Exhibit E, ECF No. 82-5.) Plaintiff advised Viaud that she would return to work on Thursday, December 6, 2018.  (Def.'s Mot., Accommodation Requests, Exhibit G, ECF No. 63-9 at 4.)  During Plaintiff's three days at home, she worked for a couple of hours.  (Parker Dep. 75:5-13.)  On December 6, 2018, Plaintiff returned to work with no limitations.  (Accommodation Requests at 5.)

Subsequently, on January 16, 2019, Plaintiff visited her doctor who advised her to restrict her workday to eight hours during her pregnancy.  (Pl.'s Resp., Doctors Notes Jan. 16, Exhibit H, ECF No. 82-8 at 3.)  Plaintiff attests that she notified Viaud that her doctor ordered that she work no more than eight hours per day during her pregnancy; Viaud testified at deposition that she has "no recollection" of being so informed.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15; Viaud Dep. 158:19-159:3.)

On February 20, 2019, Plaintiff requested to work from home because of a possible winter storm; in response, Viaud required Plaintiff to come to work.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15.)  On February 22, 2019, Plaintiff notified Human Resources that she required

pregnancy-related workplace accommodation.  Human Resources referred Plaintiff to its third-party administrator, the Hartford (*id*.), and that same day, Plaintiff submitted a request for accommodation to the Hartford.  (Pl.'s Resp., Accommodation Request, Exhibit O, ECF No. 82-15.)  Also on that same day, the Hartford notified Plaintiff that she was eligible to apply for ADA accommodation and that the deadline to submit a medical assessment in support of her request was March 15, 2019.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15.)  Defendant received notice of Plaintiff's accommodation request on February 22, 2019.  (Accommodation Request, ECF No. 82-15.)

### 3.     *Plaintiff's Termination*

On January 29, 2019, Viaud emailed Stratos Gonithellis, Senior Human Resources Business Partner at CNMC, confirming that she was awaiting approval to proceed with terminating Plaintiff's employment before her probation period was due to end in March of that year.  (Pl.'s Resp., Viaud Termination Emails, Exhibit K, ECF No. 82-11 at 8.)  In the Recommendation for Termination Form, Viaud noted the reason for Plaintiff's termination: "poor job performance and not meeting the expectations of the Job as Training Specialist." (Pl.'s Resp., Recommendation for Termination Form, Exhibit L, ECF No. 82-12.)

The Recommendation for Termination Form provides in part:

> I have reviewed Sharise's work performance during the introductory period and have found that her performance is not meeting the expectations of the job as Training Specialist, Ambulatory Services and not consistent with department expectations; therefore, termination of employment is recommended, effective Monday, February 4, 2019.
> …
> She has not been able to meet the expectations and requirements of the job. Sharise has poor attention to detail, quality of work, inability to complete work assignments or correct errors in a reasonable amount of time or by requested timeframe, inability and unwillingness to learn new tasks or skills or to work collaboratively,

inability to exercise good judgement and her work/outputs often requires oversight and often needs to be re-done. Finally, she has been spoken to on two separate occasions; November, 2018 and January, 2019 about not following the proper callout procedure communicated to her. On December 17th, during a routine monthly one on one meeting, concerns of Sharise's performance were discussed with her. Specific concerns addressed were; New Hires and Participants attending classes facilitated by Sharise were failing assessments, failure to learn require Training Materials in order to facilitate courses, failure to complete on-site observations in accordance to Training timeframes, failure to incorporate all materials into the training curriculum, failure to update Standard Operating Procedures for training and development in a timely manner, and not completing/submitting work by the requested timeframe.

…

To date, the concerns in Sharise's performance remain constant. There have been several meetings and emails (information can be provided upon request) outlining areas of opportunity in specific performance areas. Most recently, areas of improvement addressed were the Annual Assessments and Remediation initiative (curriculum development and implementation) and New Hire Reunion, to name a few.

*Id.*

On February 8, 2019, Gonithellis received final approval regarding Plaintiff's termination. (Pl.'s Resp., Codispoti Email, Exhibit M, ECF No. 82-13.)  On February 28, 2019, Viaud provided Plaintiff with her termination letter, which stated that Plaintiff's "work performance is not at a level consistent with the requirements of [her] job description[.]"  (Pl.'s Resp., Termination Letter, Exhibit S, ECF No. 82-19.)

## B.    __Procedural History__

On December 3, 2020, Plaintiff filed her original complaint.  (ECF No. 1.)  On March 16, 2021, Plaintiff filed an Amended Complaint alleging unlawful employment discrimination on the basis of sex, pregnancy, and pregnancy-related disabilities, interference with statutorily protected rights, and retaliation in violation of (1) Title VII, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"),  as

amended by the Pregnancy Discrimination Act of 1978 ("PDA"); (2) Americans with Disabilities Act of 1991, 42 U.S.C. § 12117(a) ("ADA"); and (3) Maryland Fair Employment Practices Act, MD. CODE ANN., STATE GOV'T. §§ 20-601, *et seq.* ("FEPA").  (ECF No. 12.)  On March 25, 2021, Defendant filed a motion to dismiss, which the court granted as to Plaintiff's Title VII retaliation claim and denied on all other bases.  (ECF Nos. 13, 19.)

On May 10, 2022, Plaintiff filed a Second Amended Complaint.  (ECF No. 30; "the Complaint.")  The Complaint sets forth three counts: (Count I) Sex Discrimination and Retaliation in violation of Title VII, as amended by the PDA; (Count II) Disability Discrimination and Retaliation in violation of the ADA; and (Count III) Sex and Disability Discrimination, Interference with Statutory Rights, and Retaliation in violation of FEPA.  Plaintiff seeks: (i) a declaration that Defendant discriminated against her on the basis of her sex, disability, pregnancy, and pregnancy-related medical conditions, and retaliated against her in violation of Title VII, ADA, and FEPA; (ii) back pay with prejudgment interest, lost benefits, and other damages for lost compensation and job benefits; (iii) compensation for past and future pecuniary losses; (iv) (other undefined) compensatory and punitive damages; (v) reasonable attorneys' fees and express witness fees; and (vi) any other this relief this court deems proper.  (ECF No. 30 at 9.)

On May 5, 2023, Defendant filed the Motion.  (ECF No. 63.)  Defendant moves for summary judgment on the following grounds: (1) as to Plaintiff's disability claim in Counts II and III: (i) there is no evidence of a disability that substantially limited one or more major life activities; and (ii) Plaintiff's work request was not a disability accommodation request; (2) as to her pregnancy-related disability discrimination claims in all counts: (i) Plaintiff was not performing her job at a level that met Defendant's legitimate expectations; (ii) Plaintiff cannot identify any similarly-situated co-workers who were treated more favorably; and (iii) Plaintiff cannot rebut

Defendant's legitimate, non-discriminatory reasons for the alleged adverse employment actions; (3) as to her retaliation claim in Counts II and III, there is no causal connection between Plaintiff's accommodation request and her termination.  (ECF No. 63-1 at 3-4.)

## II.     LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56.  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.   Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).  Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

Further, in undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d

at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  Critically, on a Rule 56 motion, the court "must not weigh evidence or make credibility determinations."  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. Of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

## III.   ANALYSIS

### A.   Title VII and PDA Principles / *McDonnell Douglas* Framework

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2, and (ii) retaliation against an employee for opposing adverse actions that she reasonably suspects to be unlawful under Title VII, 42 U.S.C. § 2000e-3."  *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018).  "In 1978, Congress enacted the [PDA], 92 Stat. 2076, which added new language to Title VII's definitions subsection."  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 212 (2015).  The first clause of the PDA provides that Title VII's "terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions[.]"  42 U.S.C. § 2000e(k).  The second clause provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  *Id.*  Accordingly, "a claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII."  *DeJarnette v. Corning Inc.*, 133 F.3d 293, 297 (4th Cir. 1998).

"A plaintiff pursuing a claim under Title VII may either offer direct evidence of discrimination or, using indirect evidence, she may rely on the burden shifting framework that was adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)."[2] *Coleman v. Whitley*, No. 21-1181, 2022 WL 16630570, at *2 (4th Cir. Nov. 2, 2022). "To satisfy ordinary principles of proof, [a plaintiff] must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Cole v. Fam. Dollar Stores of Md., Inc.*, 811 F. App'x 168, 175 (4th Cir. 2020) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)).

Absent direct evidence, a plaintiff must establish a prima facie case pursuant to the *McDonnell Douglas* standard. *McDonnell Douglas Corp.*, 411 U.S. at 802. Pursuant to the *McDonnell Douglas* standard, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254. "To establish a 'presumption' is to say that a finding of the predicate fact (here, the prima facie case) produces 'a required conclusion in the absence of explanation' (here, the finding of unlawful discrimination)." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977)).

---

[2] As discussed below, ADA discrimination and retaliation claims are also subject to the *McDonnell Douglas* burden-shifting framework. *See* Sections III.C. and III.E., *infra.*

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for [the employment action]." *McDonnell Douglas Corp.*, 411 U.S. at 802.  "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 254-55).  "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (citations omitted).  "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Hicks*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253).

In *Mitchell v. Data General Corporation*, the Fourth Circuit noted that "[w]hile the proof scheme in a discrimination case can make the summary judgment analysis somewhat trickier, a defendant can still obtain a summary judgment in one of two ways."  12 F.3d 1310, 1316 (4th Cir. 1993).  A defendant "can demonstrate that the plaintiff's proffered evidence fails to establish a prima facie case, or, if it does, the defendant can present evidence that provides a legitimate nondiscriminatory explanation about which the plaintiff does not create a factual dispute." *Id.*; *see Henson v. Liggett Group, Inc.*, 61 F.3d 270, 274 (4th Cir. 1995) (explaining that "[a]n employer is entitled to summary judgment if the plaintiff fails to establish a prima facie case of discrimination or fails to raise a factual dispute regarding the employer's proffered reasons for the alleged discriminatory act").  "[T]he mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 943 (4th Cir. 1992)).

    **B.**    <u>**Title VII and FEPA Discrimination (Counts I and III)**</u>

    In Count I, Plaintiff asserts a claim of discrimination on the basis of pregnancy in violation of Title VII and the PDA.  In Count III, Plaintiff asserts a claim of discrimination on the basis of pregnancy in violation of FEPA.  Because "FEPA is the state law analogue to Title VII" and FEPA "is also analyzed under the *McDonnell Douglas* burden-shifting framework, in line with claims under Title VII," the court will analyze Counts I and III together. *Jennings v. Frostburg State Univ.*, No. CV ELH-21-656, 2023 WL 4567976, at *18 (D. Md. June 27, 2023).

    As stated earlier, Plaintiff may establish her pregnancy discrimination claims through direct evidence or the burden-shifting framework set forth in *McDonnell Douglas*.  *Young*, 575 U.S. at 213.  Because Plaintiff has not produced direct evidence that her pregnancy motivated Defendant's decision to terminate her, she must establish her claim through the burden-shifting framework set forth in *McDonnell Douglas.*  "When a plaintiff's case is presented under the *McDonnell Douglas* proof scheme in response to a defendant's motion for summary judgment, the plaintiff must present admissible evidence to establish a prima facie case." *Mitchell*, 12 F.3d at 1315.  "Although the proof scheme is staged with shifting burdens, such discrimination cases may nevertheless be evaluated under established summary judgment principles." *Id.*  In order to prevail on its motion, therefore, upon Plaintiff's demonstration of a prima facie claim of pregnancy-related discrimination, Defendant must demonstrate that Plaintiff's "proffered evidence fails to establish a prima facie case." *Id.* at 1316.  In response, Plaintiff must then produce evidence on which a reasonable factfinder could conclude that it is more likely than not that Defendant's decision to terminate her employment was motivated by discrimination. *Evans v. Technologies Applications*

*& Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

In general, "[a]bsent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."[3] *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "[H]owever, the prima facie requirements are not set in stone, and 'differing factual circumstances may require adaptation.'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 219 (4th Cir. 2016) (quoting *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991)).

It is undisputed that Plaintiff establishes elements one and three. Plaintiff was pregnant at the time she was terminated and suffered an adverse employment action when she was terminated. *See Holmes v. e.spire Communications*, 135 F. Supp. 2d 657, 662 (D. Md. 2001) (finding that the pregnant plaintiff was a member of the protected class and suffered an adverse employment action when she was terminated). Therefore, the court's analysis will focus on elements two and four.

### 1. *Satisfactory Job Performance*

Defendant argues that Plaintiff cannot demonstrate that her job performance was satisfactory. (ECF No. 63-1 at 25.) In response, Plaintiff argues that she has established that she was performing her job in a manner that met Defendant's expectations. (ECF No. 82 at 28.)[4]

To satisfy the second element, Plaintiff "must show that she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action." *Rodgers v. Eagle Alliance*, 586 F. Supp. 3d 398, 438 (D. Md. 2022) (citation omitted). In analyzing satisfactory job performance, Plaintiff's testimony is not competent to generate a dispute of fact as to whether Plaintiff met Defendant's expectations. *King v. Rumsfeld*, 328 F.3d

---

[3] As discussed below, the parties disagree on the fourth element. *See* Section III.B.2, *infra.*
[4] The court cites to the ECF pagination.

145, 149 (4th Cir. 2003).  It is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).  The plaintiff, however, is not required "to show that [s]he was a perfect or model employee."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).  "Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting h[er] employer's legitimate expectations."  *Id.*

Here, Plaintiff provides sufficient evidence to create a genuine issue of material fact that she was performing at a satisfactory level.  Specifically, on January 10, 2019, Viaud emailed Plaintiff stating, "Great work with the schedule."  (Pl.'s Resp., Viaud Emails Praising Parker Performance, Exhibit B, ECF No. 82-3 at 41.)  On January 11, 2019, Viaud forwarded to Plaintiff Viaud's email to a new hire (Charles) recommending that the new hire arrange a standing meeting with Plaintiff in order that Plaintiff mentor Charles.  *Id.* at 42.  The email reads in part:

> Good morning Charles,
>
> The Orientation and Training runs from 8:30 to 5:00 (except for Friday which it ends at 3:00 pm).  The amount of time you shadow should depend on what you and John can arrange for you to provide and what you are looking to get out of shadowing.  Orientation and Training meets once a month every month so you are always welcomed to shadow.  With that being said, you could attend one day or all if you are able to.  **What I would also recommend is that you set up time or a standing meeting with Sharise as a Mentor if this is really something you want to explore.  She has extensive years of experience as a Facilitator and would be a great resource for you.**  You could determine a plan for you to gain experience and insight with facilitating or assisting with proctoring courses with Ambulatory Services (with John's approval of course)[.]

*Id.* (emphasis added.)

Later that same month, on January 31, 2019, Viaud commended Plaintiff by email: "Excellent scores on the assessment!"  *Id.* at 44.  Two days before Plaintiff's termination, Viaud

again emailed Plaintiff: "Excellent scores!" *Id.* at 50.  While Defendant has offered evidence that Plaintiff's employment performance was also problematic, Plaintiff provides sufficient evidence on which a factfinder could reasonably rely to conclude that she was performing at a satisfactory level.  Therefore, Plaintiff satisfies the second requirement to state a prima facie case.  *See Haynes*, 922 F.3d at 225 (finding that the plaintiff provided evidence that he was performing at a satisfactory level where weeks before his termination his supervisor informed him that "everything looks good" and he received a bonus).

## 2.   *Different Treatment / Appropriate Comparator*

As to the fourth element, Defendant argues that Plaintiff fails to produce evidence that she was treated differently than any similarly situated employee not in a protected class.  (ECF No. 63-1 at 27.)  In response, Plaintiff maintains that Title VII does not "require comparator evidence to establish a prima facie case of discrimination."  (ECF No. 82 at 29.)  Specifically, Plaintiff argues:

> In any formulation of the prima facie case, the central inquiry is whether the evidence presented is sufficient to create an inference (*i.e.*, a rebuttable presumption) that the decision was based on unlawful grounds. Consequently, a plaintiff may make out a prima facie case by showing that she belongs to a protected class, was qualified for her job, and was subjected to an adverse employment decision "under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) at 253 (emphasis added). Here, Ms. Parker presented evidence that she was a pregnant woman, that she was qualified for her position, that her class attendees were passing their assessments, that her supervisor recommended her to be a mentor to another employee, that she received consistent praise for her work performance, that she was never written-up, suspended, or disciplined in anyway, that she was never presented with a Corrective Action Form as required, that she notified her supervisor of her pregnancy and need for an accommodation, and that her supervisor then sought permission to terminate her employment for alleged poor performance but ultimately kept her in the role for four additional weeks where her supervisor continued to praise her

performance up to the day before her termination.

(ECF No. 82 at 30.)

In *Texas Department of Community Affairs v. Burdine*, the United States Supreme Court addressed "whether, after the plaintiff has proved a prima facie case of discriminatory treatment, the burden shifts to the defendant to persuade the court by a preponderance of the evidence that legitimate, nondiscriminatory reasons for the challenged employment action existed." 450 U.S. 248, 250 (1981). The *Burdine* Court briefly discussed the plaintiff's burden of establishing a prima facie case of disparate treatment and explained that "[t]he plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 253. In a footnote, the *Burdine* Court noted that there was no dispute that the plaintiff proved a prima case:

> In *McDonnell Douglas, supra*, we described an appropriate model for a prima facie case of racial discrimination. The plaintiff must show:
>
> "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S., at 802, 93 S.Ct., at 1824.
>
> We added, however, that this standard is not inflexible, as "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations." *Id.*, at 802, n. 13, 93 S.Ct., at 1824 n. 13.
>
> In the instant case, it is not seriously contested that respondent has proved a prima facie case. She showed that she was a qualified woman who sought an available position, but the position was left open for several months before she finally was rejected in favor of a male, Walz, who had been under her supervision.

16

450 U.S. at 253 n. 6.  Further, the Court emphasized the importance of a prima facie case:

> The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. *See Teamsters v. United States*, 431 U.S. 324, 358, and n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396 (1977). As the Court explained in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.

*Id.* at 253-54.  While in *Burdine* there was no dispute that the plaintiff proved a prima facie case, the court agrees with Plaintiff that the prima facie requirements are flexible and "differing factual circumstances may require adaptation."  *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991); *see Burdine, supra.*

The court finds *Glunt v. GES Exposition Services, Inc.* instructive.  123 F. Supp. 2d 847 (D. Md. 2000).  There, the plaintiff argued that, to satisfy the fourth element, she may show "that her demotion occurred under circumstances giving rise to a reasonable inference of discrimination."  *Id.* at 865.  The *Glunt* court agreed:

> Courts of Appeals from other circuits have applied such a standard to discriminatory discharge or demotion claims based upon sex, pregnancy, and race. *See Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1229 (10th Cir.2000) ("[T]he fourth prong of a plaintiff's prima facie test in a discharge case should be the same as for a failure to hire claim . . . . because comparison to a person outside of the protected class in the fourth prong of the prima facie case is unnecessary to create an inference of discriminatory discharge."); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) ("[N]othing in Title VII requires a gender-discrimination plaintiff to prove that he or she was replaced by someone outside the protected class . . . ."); *Kerzer v. Kingly Mfg.*, 156 F.3d 396 (2d Cir. 1998) ("[A] plaintiff may establish a prima facie case by demonstrating that the discharge occurred in circumstances giving rise to an inference of unlawful

discrimination."); *Nieto v. L & H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) ("While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.'"). The above cases manifest an understanding that, "although the plaintiff's prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged, the essential purpose served by a prima facie test remains the same." *Kendrick*, 220 F.3d at 1227.

As the Supreme Court has emphasized, "the proper solution . . . lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . . '" *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312–13, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (age discrimination) (quoting *Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)). Likewise, in *Brown*, the Fourth Circuit recognized that the fourth element may be modified given the distinctive facts of a particular claim, "such as in age discrimination cases where a plaintiff within the protected class is replaced by another, but significantly younger, person within the same class, . . . , where there has been a significant lapse of time between the plaintiff's application and its eventual decision to hire another individual within the same protected class, . . . or where the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination toward the plaintiff." 159 F.3d at 905 (citations omitted). Similarly, in other instances of employment discrimination, the Fourth Circuit has recognized that the fourth element may be satisfied by a showing that the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 230 (4th Cir. 1999) (applying standard to gender discrimination claim based upon failure to promote.) *cert. denied*, 528 U.S. 1189, 120 S.Ct. 1243, 146 L.Ed.2d 101 (2000); *Brown*, 159 F.3d at 902 (applying standard to gender discrimination claim alleging failure to hire); *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir.1997) (age discrimination); *Dickens v. MCI Telecommunications Corp.*, 78 F.3d 578, 1996 WL 93810, at *3 (4th Cir. 1996) (unpublished opinion) (stating fourth element for discriminatory demotion based upon race and age could be satisfied by "some other evidence that age or race was not treated neutrally"); *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993), 12 F.3d 1310, 1315 (modifying the fourth element, "[i]n the context

of a reduction-in-force, . . . where . . . the third and fourth elements . . . become meaningless."); *Alvarado v. Board of Trustees of Montgomery Community College*, 928 F.2d 118, 121 (4th Cir. 1991) ("[T]he components of the test will vary with differing applications of Title VII.") Given the higher courts departure from a "rigid" application of the necessity of a similarly situated replacement where such a showing lacked probative value and evidence of discriminatory animus existed, the Court believes that Plaintiff may show that her demotion occurred under circumstances giving rise to a reasonable inference of discrimination to meet her prima facie burden under *McDonnell Douglas.*

123 F. Supp. 2d at 865-67.

The *Glunt* court found that the plaintiff produced direct evidence of discriminatory animus because there was evidence of derogatory remarks made by the plaintiff's supervisor. *Id.* at 866. Further, the court noted the evidence of the plaintiff's supervisor's sudden hostility upon learning of her pregnancy. *Id.* at 867. Thus, the court explained that "[t]he timing of [the] [p]laintiff's perceived decline in performance and the accompanying negative remarks relating to [the] [p]laintiff's pregnancy are sufficient to give rise to a reasonable inference of discrimination." *Id.* The *Glunt* court further noted that the plaintiff produced evidence that her former position remained open and that a similarly situated employee (who did not share the protected status) was treated differently. 123 F. Supp. 2d at 867. On this basis, and considering the full record, the *Glunt* court concluded: "Given that her demotion occurred under circumstances giving rise to a reasonable inference of unlawful discrimination, that other Account Executives experiencing performance problems were treated differently than Plaintiff, and that her position remained open after her demotion, Plaintiff has made the requisite prima facie showing under the *McDonnell Douglas* standard." *Id.* at 868.

The court further finds *Brown v. McLean* instructive. 159 F.3d 898 (4th Cir. 1998). There, the plaintiff argued that district court erred in granting summary judgment against him on his sex

discrimination claim.  *Id.* at 905.  In affirming the district court's grant of summary judgment and

concluding that the plaintiff failed to establish a prima facie case of sex discrimination, the Fourth

Circuit explained:

> In order to make out a prima facie case of discriminatory
> termination, a plaintiff must ordinarily show that the position
> ultimately was filled by someone not a member of the protected
> class. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113
> S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Klein v. Derwinski*, 869 F.
> Supp. 4, 7 (D.D.C.1994). Although some courts have indicated that
> there may be exceptions to this rule in limited situations, such as in
> age discrimination cases where a plaintiff within the protected class
> is replaced by another, but significantly younger, person within the
> same class, *see, e.g., O'Connor v. Consolidated Coin Caterers
> Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)
> (holding in age discrimination claim that fact that plaintiff in
> protected class has been replaced by another person in protected
> class is irrelevant, so long as he has been replaced because of his
> age), where there has been a significant lapse of time between the
> plaintiff's application and its eventual decision to hire another
> individual within the same protected class, *see, e.g., Howard v.
> Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir. 1984)
> (finding lapse of eleven months would significantly diminish
> reliability of subsequent hiring as indicator of employer's intent at
> time it rejected plaintiff's application and thus could not rule out
> inference of discrimination in connection with earlier denial of
> plaintiff's application), or where the employer's hiring of another
> person within the protected class is calculated to disguise its act of
> discrimination toward the plaintiff, *see, e.g., Jones v. Western
> Geophysical Co.*, 669 F.2d 280, 284–85 (5th Cir.1982). None of
> these exceptions are applicable here. Even if Brown had applied for
> the DCS position, the city hired another male for the position at the
> same time that Brown would have been considered for the position.
> Neither has Brown presented any evidence that the city's hiring of a
> male for the DCS position was designed to hide discrimination
> against Brown on the basis of his gender.

159 F.3d at 905-906.

     While Plaintiff is "not required as a matter of law to point to a similarly situated comparator

to succeed on a discrimination claim,"  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010)

(citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir.2003)); *see Laing v. Fed.*

*Exp. Corp.*, 703 F.3d 713, 720 (4th Cir. 2013) (noting that "[t]his is not to say that comparator evidence is the final answer in the discrimination law"); *Kande v. Luminis Health Drs. Cmty. Med. Ctr., Inc.*, No. 8:21-CV-01262-PX, 2023 WL 2478931, at *6 (D. Md. Mar. 13, 2023) (noting that "[a]lthough comparator evidence is not required to demonstrate discriminatory animus, a plaintiff relying on such evidence must put forward comparators who are similar in all relevant respects") (citation omitted)), Plaintiff is still required to "present evidence that reasonably creates an inference of an unlawfully discriminatory motive to shift the burden to" Defendant. *Noonan v. Consolidated Shoe Co., Inc.*, 84 F.4th 566, 573 (4th Cir. 2023); *Jones v. W. Geophysical Co. of Am.*, 669 F.2d 280, 284 (5th Cir. 1982) (noting that "[t]he underlying purpose of the fourth element in the *McDonnell Douglas* formulation is precisely to establish this unlawful inference of discrimination").

Here, the court's analysis begins with the context of Plaintiff's discrimination claim and the nature of the adverse employment action alleged. *See Glunt, supra* (explaining that the "prima facie test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged"). In the Complaint, Plaintiff alleges:

> Ms. Parker disclosed her pregnancy to Ms. Viaud in late November 2018.
>
> Thereafter, Ms. Viaud began treating Ms. Parker differently and less favorably, subjected her to heightened scrutiny and exaggerated criticisms, pressured her to specify when and how much time she planned to take off for the birth of her child, made statements demonstrating pregnancy-based animus and/or bias, denied her informal requests for accommodations she needed as a result of pregnancy-related impairments, and, ultimately, terminated her within days of learning that she had submitted a formal request for reasonable accommodations related to her pregnancy.
>                                   …
> Importantly, before Ms. Parker disclosed that she was pregnant, Ms. Viaud often permitted Ms. Parker to work from home. 26. In

> addition, Ms. Viaud allowed other employees who were not affected
> by pregnancy to work from home and Ms. Viaud routinely worked
> from home.
>
> …
>
> CNMC discriminated against Ms. Parker on the basis of her sex,
> pregnancy, and pregnancy-related medical conditions and retaliated
> against her in violation of Title VII and the Pregnancy
> Discrimination Act by treating her differently and less favorably
> than similarly situated employees not affected by pregnancy,
> repeatedly denying her informal requests for reasonable
> accommodations relating to her pregnancy, and summarily firing
> her within days of learning that she made a formal request for
> reasonable accommodations relating to her pregnancy.

(ECF No. 30 ¶¶ 12-13, 25-26, 38.)

On the record before the court, Plaintiff presents evidence that she previously worked from home during regular work hours and that Viaud and another employee, JaDonna Harris,[5] occasionally worked from home for various reasons.  (Pl.'s Suppl. Answers to Def.'s Interrog. No. 15.)  In her deposition, Plaintiff testified that the same expectation level was not set for her and JaDonna, such that JaDonna had no problems leaving work early.  (Parker Dep. 108:1-9.)  Plaintiff further provides evidence that Defendant immediately sought to fill Plaintiff's position after she was terminated on February 28, 2019.  (Pl.'s Resp., Filling Parker's Position, Exhibit T, ECF No. 20.)  On April 19, 2019, Defendant hired a new employee.  *Id.*

While Plaintiff's allegations and evidence suggests that her discrimination claim is based, in part, upon comparison to employees outside the protected class, regarding the fourth element, Plaintiff fairly concedes that she has neither comparator evidence nor evidence that the position was filled by a similarly qualified applicant outside the protected class.  Plaintiff argues that, even in the absence of such evidence, the fourth prong is satisfied because the circumstances surrounding her termination suggest an unlawful discriminatory motive.  (ECF No. 82 at 30.)  The

---

[5] The court notes that in the transcript of Plaintiff's deposition, JaDonna Harris' name is spelled JoDonna.

court disagrees.

Importantly, as set forth above, in *Glunt*, the court departed from the "necessity of a similarly situated replacement" because the circumstances showed a lack of probative value and evidence of discriminatory animus existed.  123 F. Supp. 2d at 865-67.  Accordingly, the *Glunt* court concluded that the plaintiff may show that her demotion occurred under circumstances giving rise to a reasonable inference of discrimination to meet her prima facie burden under *McDonnell Douglas. Id.*  In the instant case, Plaintiff alleges that Viaud treated her differently, subjected her to heightened scrutiny, and made statements demonstrating pregnancy-based animus, however, outside of her own testimony, Plaintiff fails to produce evidence in support of these allegations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003);  *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

Specifically, in contrast to the *Glunt* plaintiff, Plaintiff provides no evidence that Viaud's conduct or behavior underwent a noticeable change after learning of Plaintiff's pregnancy, that Viaud made negative remarks regarding Plaintiff's pregnancy, or that Viaud became increasingly critical of Plaintiff's job performance after learning of Plaintiff's pregnancy.  *See Glunt, supra.* Plaintiff fails to generate evidence to support departure from the standard requirement of a similarly situated replacement on the basis that she was terminated under circumstances giving rise to an inference of discrimination.  Accordingly, Plaintiff fails to establish the fourth prong of a prima facie case.  Defendant is entitled to judgment as a matter of law on Plaintiff's claims of pregnancy-based discrimination in employment in Counts I and III.

C.      **ADA—Failure to Accommodate (Count II)**

Plaintiff alleges a failure to accommodate and disability discrimination in violation of the

ADA.[6]  Defendant argues it is entitled to summary judgment because no reasonable fact finder could conclude that Plaintiff was an individual with a disability under the ADA.  (ECF No. 63-1 at 19.)  In response, Plaintiff maintains that her pregnancy-related complications constitute a disability within the meaning of the ADA.  (ECF No. 82 at 14.)

"Congress enacted the Americans with Disabilities Act in 1990 to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *A Helping Hand, LLC v. Baltimore County,* 515 F.3d 356, 361 (4th Cir. 2008) (citation omitted).  "The Act prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131–12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182–12189."  *Id.*  Relevant here, Title I of the ADA prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

"Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases."  *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001).  Thus, "[d]isability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework."  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).

Whether Plaintiff's ADA claim is based on disparate treatment, failure-to-accommodate,

---

[6] Plaintiff's argument on this claim is limited to her alleged status as an individual with a disability and Defendant's alleged failure to provide reasonable accommodation.  Plaintiff does not present argument or facts to support an ADA claim on the bases of disparate treatment or wrongful discharge.

or wrongful discharge, to survive Defendant's Motion on the claims of discrimination under the ADA, Plaintiff must prove that she has a disability.[7] *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 487 (D. Md. 2013); *see Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) ("In a failure-to-accommodate case, an employee establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations."); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) ("To establish a claim for disability discrimination under the ADA, a plaintiff must prove '(1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that [her employer] discharged her (or took other adverse employment action) because of her disability.'") (quoting EEOC v. *Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)); *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (citation omitted) (explaining that to establish a claim for a wrongful-discharge claim under the ADA, a plaintiff is "required to produce evidence sufficient to demonstrate that (1)[s]he was a qualified individual with a disability; (2) [s]he was discharged; (3) [s]he was fulfilling h[er] employer's legitimate expectations at the time of discharge; and (4) the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination").

"The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'" *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (quoting 42 U.S.C. § 12112(a) (2012)). "The Act prohibits covered employers from discharging qualified employees because they are disabled." *Id.* "Under the ADA, a 'disability'

---

[7] *See* n.6, *supra*.

may take any of the following forms: (1) 'a physical or mental impairment that substantially limits one or more major life activities' (the 'actual-disability' prong); (2) 'a record of such an impairment' (the 'record-of' prong); or (3) 'being regarded as having such an impairment' (the 'regarded-as' prong)." *Id.* (quoting 42 U.S.C. § 12102(1)).  Plaintiff asserts she had an actual disability.

In *Miller v. Maryland Department of Natural Resources*, the Fourth Circuit succinctly explained:

> An individual alleges he has an actual disability when he alleges (1) a physical or mental impairment that (2) substantially limits (3) one or more major life activities. Major life activities include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. Major life activities also include the operation of a major bodily function, including but not limited to, . . . neurological . . . functions. For a major life activity to be substantially limit[ed], the impairment need only substantially limit[ ] the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Importantly, this standard is much more lenient than the previous ADA standard. Prior to the enactment of the ADAAA in 2009, the regulations and case law held, [s]ubstantially in the phrase substantially limits suggests considerable or to a large degree. Courts also considered factors such as the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment . . . .
>
> There is no requirement that an actual disability be long lasting or severe. Determining whether the activity is substantially limited compared to most people usually will not require scientific, medical, or statistical analysis.

813 F. App'x 869, 875 (4th Cir. 2020) (citations omitted).

"With respect to pregnancy specifically, the EEOC has indicated that a pregnancy-related

impairment that substantially limits a major life activity is a disability . . . ." *Saah v. Thumel*, No. CV RDB-15-2425, 2017 WL 491221, at *6 (D. Md. Feb. 7, 2017) (citation omitted). "However, this [c]ourt has previously noted that [w]ith near unanimity, federal courts have held that pregnancy [alone] is not a disability under the ADA." *Id.* (citation omitted). At this stage, Plaintiff is required to produce "sufficient evidence to lead a reasonable jury to conclude that she had an impairment that 'substantially limit[ed]' any 'major life activit[y],' such as work." *Wonasue*, 984 F. Supp. 2d at 490. The question of whether Plaintiff is disabled under the ADA is "a question of law for the court." *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595, 608 (D. Md. 2002)), *aff'd*, 703 F. App'x 211 (4th Cir. 2017)).

Defendant argues that Plaintiff fails to produce evidence that she was "substantially limited as a result of her pregnancy and fibroid-related complications." (ECF No. 63-1 at 21.) In response, Plaintiff argues that "the evidence conclusively establishes that [she] had 'a preexisting medical condition that could cause complications with her pregnancy,' that her pregnancy was considered 'high risk' and required a cesarian section, that she had uterine fibroids and suffered a fibroid rupture that caused a bleed and required an emergency room visit and three days off from work, and that her 'doctor recommended that she work no more than an 8-hour workday.'" (ECF No. 82 at 13.)

On this issue, the court finds guidance from *Wonasue v. University of Maryland Alumni Association*, 984 F. Supp. 2d 480 (D. Md. 2013). In *Wonasue*, the plaintiff brought a claim for discriminatory discharge and failure to accommodate under the ADA. *Id.* at 486. The defendants filed a motion for summary judgment arguing that the plaintiff was not disabled within the meaning of the ADA. *Id.* at 482. The *Wonasue* court summarized the defendants' arguments:

> Defendants assert that Wonasue was not disabled within the meaning of the ADA, the Rehabilitation Act, or the Maryland Code

because pregnancy and related medical complications generally do not constitute a physical impairment under the ADA, absent unusual circumstances, which do not exist in this case. According to Defendants, Wonasue had only common, temporary symptoms such as nausea, vomiting, and dehydration associated with routine morning sickness, and [t]he only treatment that the doctor ordered was, one day of bed rest, a prescription for anti-nausea medication, and for her to take some vitamins for her slightly low potassium. Defendants insist that Wonasue has not established (nor has she even alleged) that she was limited in the major life activity of working, let alone, substantially limited in any other way because of her morning sickness. In their view, the fact that Wonasue's doctor did not believe that her morning sickness limited her in any way is sufficient to establish[ ] that Wonasue was not limited in performing any major life activity. Defendants argue that any impairment Plaintiff experienced was too short to substantially limit a major life activity.

*Wonasue*, 984 F. Supp. 2d at 488-89.   In concluding that the plaintiff failed to demonstrate an

ADA-qualifying disability, the *Wonasue* court relied on the Fourth Circuit's decision in *Brockman*

*v. Snow*, 217 F. App'x 201, 204 (4th Cir. 2007).  The *Wonasue* court explained:

Plaintiff has not alleged that Defendants regarded her as having a substantially-limiting impairment. *See* 42 U.S.C. § 12102(2)(C). To the extent that she claims that she had a substantially-limiting impairment or a record of such an impairment, *see* 42 U.S.C. § 12102(2)(A, B); Compl. ¶ 44 (Plaintiff had a "pregnant and medical condition" of which Defendants were aware), *Brockman*, 217 Fed. Appx. 201, is informative. There, the plaintiff, a program analyst for the IRS, "became pregnant and was hospitalized for acute pregnancy complications, including bleeding and threatened abortion." *Id.* at 204. She received a "medical certificate" for her doctor "endorsing her ability to work from home if she remained on bed rest until further notice; there was no indication of how long the bed rest would be necessary." *Id.* The plaintiff called her supervisor and asked to work from home, and she faxed her supervisor a copy of the medical certificate. *Id.* Her supervisor denied the request. *Id.* The plaintiff filed suit, alleging, *inter alia*, failure to accommodate under the Rehabilitation Act. *Id.* at 205. The district court granted summary judgment in favor of the IRS on the Rehabilitation Act claim on the basis that "Brockman failed to show a disability under the Act." *Id.* On appeal, the Fourth Circuit concluded that, even if "pregnancy complications may constitute a disability, Brockman's evidence [fell] far short of showing that she was substantially

limited in a major life activity" where "[t]he only evidence Brockman proffer[ed] in this regard [was] her doctor's note stating that she should be on bed rest 'until further notice,' and the claim that the doctor orally instructed her not to walk long distances." *Id.* at 209. The court noted that the plaintiff did not offer "evidence of the duration of her impairment" or "its severity," two "factors that would point to a finding of a substantial limitation." *Id.*

Here, Plaintiff alleges that she was pregnant. Compl. ¶ 17. This alone is not enough for Plaintiff to have a "disability" under the ADA or the Rehabilitation Act or Maryland Employment Discrimination Law, which share the ADA definition. *See Young*, 707 F.3d at 443; *Genovese*, 2013 WL 2490270, at *5 n. 3; *Wenzlaff*, 940 F. Supp. at 890. Ms. Wonasue also claims that, "[b]eginning January 15, 2010, Plaintiff required medical leave and reasonable changes to her work schedule to accommodate severe and unusual medical complications [to her pregnancy] that threatened her own and her baby's health." Compl. ¶¶ 18–19 (emphasis added). Such complications could constitute a disability under the ADA, *Brockman*, 217 Fed. Appx. at 209, although my research has not uncovered any case in either the Fourth Circuit or this Court with such a holding to date.

Even if Plaintiff claimed sufficient complications to constitute a disability, the evidence belies Plaintiff's assertion. It is true that Plaintiff experienced more than typical morning sickness; she was diagnosed with hyperemesis of pregnancy, "a severe form of 'morning sickness', where the vomiting is excessive and may cause dehydration and chemical imbalances in the body." Discharge Instructions 4. Nonetheless, even with this diagnosis, the emergency room physician stated that Plaintiff could go back to work on January 15, 2010 with no restrictions. Work Release 1; *see* Wonasue Dep. 164:10–12; Discharge Instructions 4. Indeed, Plaintiff testified that the emergency room physician "just thought that [she] needed to regulate the potassium" and "other than that, he didn't think it was a big deal." Wonasue Dep. 155:4–6. She also testified that the physician "didn't say [she] couldn't work," *id.* at 165:10–12, and did not "tell [her] that [she] had to stop work temporarily," *id.* at 166:3–6. Additionally, she stated that she "did not have any" medical restrictions at the time she asked to work from home. Fact Finding Report. Although Plaintiff "thought" she was supposed to be on bed rest "for two weeks initially," *id.* at 167:17–18, she did not identify any evidence to that effect. *See id.* at 164:13–21, 177:12–20. Thus, the "complications" that Plaintiff experienced were less severe than in *Brockman*, 217 Fed. Appx. at 204, 209, where the plaintiff experienced "acute pregnancy complications,

>   including bleeding and threatened abortion" and was put on bed rest
>   for an indeterminate time, and the Fourth Circuit still found the
>   circumstances insufficient to establish that the plaintiff "was
>   substantially limited in a major life activity."

984 F. Supp. 2d at 489-90.[8]

The court finds further help from *Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265 (11th Cir. 2020). There, the court analyzed whether the plaintiff provided sufficient evidence that she was disabled under the ADA. *Id.* at 1272. The plaintiff maintained that she had an ADA-qualifying disability because of her ovarian cysts, uterine fibroids, and endometriosis. *Id.* at 1273. In affirming the district court's grant of summary judgment in favor of the defendant, the *Munoz* court explained:

>   The record does include evidence that Ms. Munoz's health was
>   impaired. But, despite this, we cannot conclude that Ms. Munoz's
>   impairments substantially limited her ability to sleep, work, and
>   reproduce. This is because the record does not contain evidence of
>   the timing, frequency, and duration of Ms. Munoz's impairments.
>   Without this evidence, we cannot assess whether Ms. Munoz meets
>   the definition of disabled under the ADA.
>
>   Our Court rejected a claim similar to Ms. Munoz's in *Lewis v. City
>   of Union City*, 934 F.3d 1169 (11th Cir. 2019). In that case,
>   Jacqueline Lewis asserted disability under the ADA because of a
>   permanent injury to her heart from a heart attack. *Id.* at 1179–80.
>   She argued that her condition substantially limited her ability to
>   sleep and breathe. *Id.* at 1180. In support of her ADA claims, Ms.
>   Lewis testified that she experienced "periodic shortness of breath"
>   which her primary care doctor testified "could" affect Lewis's
>   ability to sleep. *Id.* (alteration adopted). But because Ms. Lewis
>   introduced no evidence of "the severity, frequency, and duration of

---

[8] The court recognizes that *Brockman* pre-dates the 2008 Amendments to the ADA ("ADAAA") and the ADAAA "was intended to make it 'easier for people with disabilities to obtain protection under the ADA.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)). *Jacobs* further noted that "[i]n enacting the ADAAA, Congress abrogated earlier inconsistent case law." *Id. Wonasue*, however, post-dates the ADAAA and "the amendment did not entirely eliminate the requirement that a claimed disability must substantially limit a major life activity in order to constitute a disability." *Hamilton v. Prince George's Cnty.*, No. CV DKC 17-2300, 2019 WL 4735429, at *12 n.2 (D. Md. Sept. 27, 2019). "Courts have continued to apply this requirement in analyzing whether pregnancy-related complications constitute disabilities." *Id.* (citing *Brown-Wicks v. PPE Casino Resort Maryland, LLC*, No. GJH-18-2576, 2019 WL 3778677, at *3 (D. Md. Aug. 9, 2019) and *Saah v. Thumel*, No. CV RDB-15-2425, 2017 WL 491221, at *6 (D. Md. Feb. 7, 2017)).

these episodes," this Court held she did not provide sufficient evidence to show she was disabled under the ADA. *Id.* at 1180–81.

Like Ms. Lewis, Ms. Munoz does not point to evidence of the frequency or duration of her pain, exhaustion, sleep problems, or lack of bodily function control. She asserts "there were days she could not leave bed because of pain and fatigue" and she "was house bound from time-to-time." Appellant's Br. at 8, 47. We do not doubt that Ms. Munoz was quite sick at points in her Selig career. But, on review of the record, Ms. Munoz has not provided evidence of how often and how long she experienced these symptoms. We therefore cannot assess whether her impairments substantially limited her ability to work or sleep as compared to most people in the general population. *See Lewis*, 934 F.3d at 1180–81. This, in turn, means Ms. Munoz has not established she was disabled because she was limited in the major life activities of working or sleeping.

Neither did Ms. Munoz introduce evidence that she was substantially limited in reproductive function when she was employed by Selig. Reproduction is a major life activity under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 639, 118 S. Ct. 2196, 2205, 141 L.Ed.2d 540 (1998). Of course, endometriosis is a disorder of the reproductive system. *See id.* at 660, 118 S. Ct. at 2215 (Rehnquist, J., concurring in the judgment in part and dissenting in part). By definition, so are uterine fibroids and ovarian cysts. Even so, Ms. Munoz introduced no evidence that she was substantially limited in her ability to procreate because of these impairments during the time she worked for Selig. The only relevant evidence in the record is that Ms. Munoz had a hysterectomy in January 2017, which was three-and-a-half years after she was terminated by Selig. Without more evidence that Ms. Munoz was substantially limited in her ability to reproduce while she worked at Selig, she cannot establish disability for purposes of her ADA claim. *See Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (affirming grant of summary judgment to employer on ADA claim because employee had not "shown that she was substantially limited in any major life activity at the time of the employment actions complained of").

981 F.3d 1265, 1273 (11th Cir. 2020); *see Jeudy v. Attorney Gen., Dept. of Justice*, 482 F. App'x 517, 520 (11th Cir. 2012) (finding that while the plaintiff argued that "she suffered from severe pelvic pain due to fibroids on her uterus and that as a result this limited her ability to walk, stand and climb stairs," the plaintiff failed to present "evidence how her pregnancy-related pain affected

her ability to walk, stand or otherwise perform her major life activities").

The precise issue is whether Plaintiff provides evidence that she has (1) a physical or mental impairment that (2) substantially limits (3) one or more major life activities. *See Miller, supra.* Even assuming that Plaintiff's pregnancy complications constituted a physical or mental impairment, Plaintiff must also show that her pregnancy complications substantially limited a major life activity. *Hamilton v. Prince George's Cnty., Md.*, No. CV DKC 17-2300, 2019 WL 4735429, at *12 (D. Md. Sept. 27, 2019). Plaintiff fails to produce sufficient evidence on this issue.

Plaintiff's Opposition focuses on her "pregnancy-related complications" but does not address how or whether such complications substantially limited a major life activity. *See Hamilton, supra.* Plaintiff bolds, italicizes, and underlines the words "reproductive functions" in quoting the ADAA at § 12102(2)(B) on major life activities. (ECF No. 82 at 16.) The court therefore assumes Plaintiff contends that her pregnancy-related complications substantially limited her ability to reproduce. But Plaintiff provides no evidence that she was substantially limited in her reproductive functions while employed by Defendant. The court further permissively assumes that Plaintiff also contends that her pregnancy-related complications substantially limited her ability to work; however, as discussed below, the evidence on which Plaintiff relies is insufficient to demonstrate that her pregnancy-related complications substantially limited her ability to work.

The record before the court demonstrates that Plaintiff's doctor ordered that she be on bed rest for three days. (Pl.'s Resp., Emailed ER Note to Viaud, ECF No. 82-5.) Plaintiff was also restricted to an eight-hour workday due to her pregnancy. (Pl.'s Resp., Jan. 16 Dr.'s Notes, Exhibit H, ECF No. 82-8.) While Plaintiff's evidence of medical leave for pregnancy complications might, in theory, have presented a short-term limitation on her ability to work, no evidence suggests she

was in fact so limited.  It is undisputed that Plaintiff was cleared to return to work, with no

limitations, after three days of bed rest.  (Def.'s Mot., Requests for Accommodations, Exhibit G,

ECF No. 63-9 at 5.)  Moreover, Plaintiff's own actions directly contradict her assertion that her

pregnancy complications substantially limited her ability to work.  Plaintiff testified at deposition:

> Q.     Did you stay at home on bed rest for those two to three days
>        after that?
>
> A.     Yes, uh-huh.
>
> Q.     And did you work?
>
> A.     I worked for a couple hours, and then I was told that I was
>        not supposed to work and I had -- well, Itina told me I could
>        not work from home and I had to use my PTO or my vacation
>        time to be off those three days.
>
> Q.     And was that because of a doctor's note?
>
> A.     No, it was just because -- she didn't well, she didn't say
>        because your doctor said this. She just said I couldn't work
>        on anything while I was at home. And I explained to her that
>        I did work or I did a couple of tasks that morning, so I was
>        able to bill or clock in for those couple of hours, but then I
>        couldn't do anything else. But a specific reason wasn't given
>        as to -- so she didn't say, "You can't work from home
>        because your doctor said you can't work from home." The
>        doctor never specifically said, "You can't do any work from
>        home."
>
> Q.     Okay.
>
> A.     I just could not move around a lot, right, so I couldn't drive
>        in to the office.
>                                   …
>
> Q.     And did the fibroids impact your day-to-day life?
>
> A.     Yes, while pregnant.
>
> Q.     Did it impact your ability to perform your job?
>
> A.     In some instances, yes.

Q.     How so?

A.     Because of the fibroids -- so I'm not a medical physician, but from what I was told the fibroids feed off of -- I don't know if it's the blood or the hormones when the baby is growing. So as she was growing, the fibroids were growing as well, which caused – that's what caused the abdominal pressure. So in turn that's what caused some of the problems with me being at the hospital and visiting the different clinics that -- I don't know if it would be like being uncomfortable but that pressure from the baby and having to walk so much, that did hinder me from doing my job I feel like at that point.

(Parker Dep. 75:5-76:7; 219:16-220:13.)   According to Plaintiff's testimony, she continued to work while on bed rest.   *Id.*   With respect to a physician-restricted eight-hour workday, it is undisputed that Plaintiff's ordinary shift was 8:30AM to 5:00PM.   (Viaud Dep. 159:4-10.) Therefore, Plaintiff's pregnancy complications did not substantially impair her ability to work a standard shift.

Defendant is entitled to judgment as a matter of law as to Plaintiff's ADA discrimination claim contained in Count II.[9]

### D.     FEPA – Disability Discrimination / Failure to Accommodate (Count III)

Relying on Judge Hollander's memorandum opinion at ECF No. 18,[10] Plaintiff argues that

---

[9] Even were the court to conclude that Plaintiff was disabled within the meaning of the ADA, Plaintiff fails to provide evidence that "with reasonable accommodation [s]he could perform the essential functions of the position."  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).  Additionally, Defendant argues that Plaintiff cannot establish a prima facie case of failure to accommodate because Defendant in fact did all that it was legally obligated to do with respect to Plaintiff's requests for accommodations.  (ECF No. 63-1 at 22.)  The court agrees.  The last element for a failure-to-accommodate claim requires a plaintiff to show "that the [employer] refused to make such accommodations."  *Rhoads*, 257 F.3d at 387 n.11.  It is undisputed that Plaintiff did not come into work for three days per her doctor's order.  (Parker Dep. 75:5-7.)  To the extent Plaintiff argues that Defendant refused to accommodate her request to work from home during the snowstorm, Plaintiff does not provide evidence that providing such an accommodation would have addressed her alleged pregnancy-related work impairments.  *See Chughtai v. Kaiser Permanente*, No. CV PX-15-2963, 2018 WL 3049198, at *5 (D. Md. June 20, 2018) (noting that "no record evidence supports that such an extension would have provided a reasonable accommodation to address the limitations arising from her thrombophilia" and therefore, summary judgment is granted on the plaintiff's failure to accommodate claim).

[10] In her memorandum opinion at ECF No. 18, Judge Hollander noted in a footnote: "For its part, FEPA explicitly recognizes that disabilities may be 'caused or contributed to by pregnancy or childbirth,' and requires such disabilities to be considered 'temporary disabilities for all job-related purposes.'"  (citing MD. CODE ANN., STATE GOV'T § 20-

FEPA definition of disability in the context of pregnancy is "much more expansive and comprehensive."  (ECF No. 82 at 32.)  Thus, Plaintiff asserts that, even if the court concludes that she is not does fall within the definition of a qualified individual with a disability under the ADA, her FEPA claims should survive summary judgment.  *Id.* at 33.  The court disagrees.

FEPA provides, in part:

> (a) An employer may not:
>
>> (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:
>>
>>> (i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment

MD. CODE ANN., STATE GOV'T § 20-601(a)(1)(i).  Disability is defined in part:

> (b)(1) "Disability" means:
>
>> (i) 1. a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness, including epilepsy; or
>> 2. a mental impairment or deficiency[.]

*Id.* § 20-601(b)(1).  Section 20-609(b) provides that:

> (b) Disabilities caused or contributed to by pregnancy or childbirth:
>> (1) are temporary disabilities for all job-related purposes; and
>> (2) shall be treated as temporary disabilities under any health or temporary disability insurance or sick leave plan available in connection with employment.

*Id.* § 20-609(b).

That FEPA recognizes that disabilities may be "caused or contributed to by pregnancy or

---

609(b)).

childbirth" does not render the statute more permissive or expansive than the ADA. Under FEPA, Plaintiff remains burdened to demonstrate that she was disabled as statutorily defined: "[a] physical or mental impairment . . . that is caused by bodily injury, birth defect, or illness, which substantially limits one or more of an individual's major life activities."  MD. CODE REGS. 14.03.02.02(B)(6)(b); *see Jones v. CCBCC, Inc.*, No. CV SAG-19-0467, 2019 WL 6895588, at *4 (D. Md. Dec. 18, 2019) (noting that "to be disabled for purposes of the FEPA, the disability has to substantially limit one or more major life activities").  Further, the Supreme Court of Maryland has held that the definitions of disability under the ADA and Maryland law are "nearly identical." *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 218 (2016) (citing *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 599 (D. Md. 2013)); *see Saah v. Thumel*, No. CV RDB-15-2425, 2017 WL 491221, at *6-7 (D. Md. Feb. 7, 2017) (concluding that the plaintiff's limitations with her "pregnancy-related impairment" failed to establish a disability under the ADA and for the same reasons, the plaintiff failed to demonstrate how she suffered a disability with respect to her FEPA claim).

The plain language of FEPA provides that disabilities (*i.e.*, a physical or mental impairment that substantially limits a major life activity) may be caused or contributed to by pregnancy or childbirth; and such disabilities are considered temporary disabilities for all job-related purposes. Plaintiff fails to cite authority that provides or suggests that section 20-609(b) does not require Plaintiff to demonstrate she had a qualifying disability at the relevant time; nor does Plaintiff offer authority to persuade the court that it should analyze her FEPA claim separately from, or on a different basis than, her ADA claim.  In fact, courts routinely analyze the two claims together.  *See Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020) (analyzing FEPA claim using the standard set forth in the ADA and related case law); *Jones*, 2019 WL 6895588, at

*3 (noting that Montgomery County Code, FEPA, and the ADA require "a plaintiff to establish a physical or mental impairment, causing a substantial limitation in the  plaintiff's ability to engage in one or more major life activities"); *Saah*, 2017 WL 491221, at *6-7 (analyzing the plaintiff's ADA and FEPA claims together, and granting summary judgment on the plaintiff's ADA and MFEPA claims for the same reasons); *Buckmaster v. Nat'l R.R. Passenger Corp.*, No. CV RDB-19-3203, 2022 WL 1081947, at *6 (D. Md. Apr. 11, 2022) (noting that FEPA is evaluated under the same framework as the ADA); *Payne v. Medstar Health, Inc.*, No. CV RDB-21-2841, 2022 WL 17584375, at *5 (D. Md. Dec. 12, 2022) (explaining that the court routinely analyzes "[]FEPA discrimination claims under the same framework as claims brought under various federal statutes" including the ADA).

Accordingly, for the reasons set forth regarding Plaintiff's ADA claim (Count II), Defendant is entitled to judgment as a matter on of law as to the disability discrimination claim contained in Count III.

### E.    Retaliation (Counts I through III)

In Counts I through III, Plaintiff brings retaliation claims in violation of Title VII, ADA, and FEPA.[11]  The ADA anti-retaliation provision provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203. "FEPA, as the Maryland state analog to the ADA, prohibits substantially the same retaliatory conduct as the ADA."  *Davidson v. Sarnova, Inc.*, No. CV JKB-17-1067, 2017 WL 5564654, at

---

[11] In granting in part and denying in part the motion to dismiss at ECF No. 13, Judge Hollander concluded that Plaintiff failed to state a claim for retaliation under Title VII and dismissed the portion of Count I relating to retaliation.  (ECF No. 18.)  In the Second Amended Complaint, Plaintiff does not allege any additional facts to alter the analysis.  The court therefore does not revisit the issue.

*4 n.3 (D. Md. Nov. 20, 2017).  "Accordingly, courts generally treat the analysis of a retaliation claim under the ADA and FEPA as coterminous." *Id.*  (citing *Rhodes v. Comcast Cable Commc'ns Mgmt., LLC*, No. CV GLR-14-1824, 2016 WL 4376653, at *7 (D. Md. Aug. 17, 2016) (applying ADA claim analysis "as its analysis for [Plaintiff's] FEPA claims"); and *Schmidt v. Town of Cheverly, Md.*, 212 F. Supp. 3d 573, 580 (D. Md. 2016) (noting that "Maryland courts have 'traditionally [sought] guidance from federal cases in interpreting Maryland's FEPA.'") (quoting *Eubanks v. Mercy Med. Ctr., Inc.*, No. CV WDQ–15–513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015)).

Courts typically apply the standards for Title VII retaliation claims to ADA retaliation claims.  *See, e.g., Laird v. Fairfax Cty.*, 978 F.3d 887, 893 n.5 (4th Cir. 2020) (noting that "[a]lthough [the plaintiff's] case involves claims under the ADA, we treat the Title VII context as being 'analogous' to the ADA for this purpose").  Therefore, "[i]n order to prevail on a claim of retaliation [under the ADA], a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under [the *McDonnell Douglas*] burden-shifting method."  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001).

To establish a prima facie case of retaliation, "a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action."  *Rhoads*, 257 F.3d at 391 (internal citations omitted).  It is undisputed that Plaintiff establishes an adverse employment action – termination.  Accordingly, the court's analysis will focus on elements one and three.

### 1.    *Protected Activity*

Plaintiff contends that she engaged in a protected activity when she informally requested a

limitation on her work hours on or about January 22, 2019.[12]  (ECF No. 82 at 31.)  Specifically,

Plaintiff argues:

> As noted previously in the Statement of Disputed and Undisputed Facts, on January 16, 2019, Ms. Parker visited her doctor who instructed her to limit her workday to 8 hours due to pregnancy complications. Approximately one week later, on January 22, 2019, Ms. Parker notified her supervisor, Ms. Viaud, of this restriction per her doctor's orders. Ms. Viaud dismissed the restriction, stating that Ms. Parker's pregnancy was "no excuse." About one week after Ms. Parker requested this accommodation, on January 29, 2019, Ms. Viaud emailed Human Resources seeking guidance on terminating Ms. Parker's employment.

(ECF No. 82 at 31-32.)  Defendant argues that, even if the court considers this aspect of Plaintiff's

claim of retaliation, "no reasonable finder of fact could conclude that Ms. Viaud should have

recognized Plaintiff's request to limit her work hours as an accommodation request under the

ADA." (ECF No. 86 at 7.)  Defendant further contends there is no evidence to suggest that Plaintiff

informed Viaud that she needed to limit her work hours due to a medical impairment.  *Id.* at 6.

The precise issue is whether Plaintiff notifying Viaud that she needed to limit her work

---

[12] In its Reply, Defendant argues that Plaintiff asserts a new and unsupported claim of retaliation in her Opposition, and therefore, the court should not consider it.  (ECF No. 86 at 16.)

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]"  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, "the liberal pleading standards mandated by the Federal Rules of Civil Procedure do 'not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.'"  *Phillips v. Raytheon Applied Signal Tech., Inc.*, No. CIV.A. ELH-11-3230, 2013 WL 5440802, at *14 (D. Md. Sept. 27, 2013), *aff'd*, 556 F. App'x 265 (4th Cir. 2014) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)).  "Rather, at the summary judgment stage, 'the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.'"  *Id.* (quoting *Gilmour*, 382 F.3d at 1315).

The court agrees with Defendant that, in her Complaint and throughout discovery, Plaintiff maintained that Defendant retaliated against her "after she made a formal request for an accommodation with Defendant's third-party administrator."  (ECF No. 30 ¶ 50; Parker Dep. 229:4-22.)  In her Complaint, however, Plaintiff also alleges that, in mid-January 2019, she informed Viaud of her doctor's recommendation that she work no more than an eight-hour work day.  (ECF No. 30 ¶ 18.)  While Plaintiff's Complaint does not make clear that she engaged in a protected activity when she requested the eight-hour workday accommodation, Defendant was adequately on notice of Plaintiff's informal and formal requested accommodations.  Accordingly, the court will consider whether the claim survives the Motion.

hours to eight hours constitutes an accommodation request under the ADA. *See Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (holding that an accommodation request constitutes protected activity that may sustain a retaliation claim); *Leckie v. Bd. of Educ. of Montgomery Cnty.*, No. CV TDC-23-0299, 2023 WL 8809310, at *7 (D. Md. Dec. 19, 2023) (holding that "for purposes of a retaliation claim, an employee's request for reasonable accommodations is a protected activity.").

The court finds *Kelly v. Town of Abingdon* instructive. 90 F.4th 158 (4th Cir. 2024). There, the plaintiff filed suit asserting claims for discrimination, retaliation, failure to accommodate, and interference in violation of the ADA. *Id.* at 165. The plaintiff suffered from anxiety, depression, and high blood pressure. *Id.* at 163. On one occasion, a law firm representing the plaintiff sent a letter to the defendant titled "Accommodation Requests." The letter made reference to the ADA and contained twelve "requests." *Id.* at 164. The defendant filed a motion to dismiss, which the district court granted in part and denied in part – and allowed the retaliation claim to go forward, but curtailed the scope of it. *Id.* at 165. "Specifically, the court ruled as a matter of law that the January 2018 Letter was not an accommodation request, and could not serve as a predicate for either claim." *Id.*

On appeal, the plaintiff argued that the district court erred in limiting the scope of his retaliation claim by ruling that a letter sent to the defendant "seeking changes to the daily office environment" was not an ADA request for accommodation. *Kelly*, 90 F.4th 158, 164-65 (4th Cir. 2024). The Fourth Circuit rejected the plaintiff's argument:

> The Americans with Disabilities Act requires employers to provide their disabled employees with reasonable accommodations that enable them to fulfill the essential duties of their positions. 42 U.S.C. § 12112(b)(5)(A); *see also Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022). Employers need only accommodate "the known physical or mental limitations of an

otherwise qualified employee with a disability." *See Wirtes v. City of Newport News*, 996 F.3d 234, 238 (4th Cir. 2021) (cleaned up). Before an employer is required to accommodate a disabled employee, "the employee must make an adequate request, thereby putting the employer on notice." *Lashley*, 66 F.4th at 179 (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 347 (4th Cir. 2013)); *see also Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.").

It is not difficult to request an accommodation. To trigger an employer's duty to accommodate, a disabled employee need only "communicate[ ] [his] disability and desire for an accommodation." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015). In this initial request, an employee need not specify "the precise limitations resulting from the disability," *see Lashley*, 66 F.4th at 179 (cleaned up), or "identify a specific, reasonable accommodation," *Jacobs*, 780 F.3d at 581. Rather, when a valid request leaves "the precise nature of the disability or desired accommodation" ambiguous, the employer should seek clarification. *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 487 n.14 (5th Cir. 2023) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005)). That is because ADA regulations contemplate that the employer will pursue an "informal, interactive process" with its disabled employees to ascertain the extent of their disabilities and the range of accommodations that might address them. *Wilson*, 717 F.3d at 346 (quoting 29 C.F.R. § 1630.2(o)(3)).

Neither party disputes that Kelly informed the Town that he suffers from anxiety, depression, and high blood pressure. The Town conceded this point during oral argument, and the Amended Complaint alleges as much. Kelly claims that the EEOC charges he filed in late 2017 placed the Town on notice of his disabilities; that the department heads were aware of his charges of discrimination; and that "his filings were a well-discussed subject matter at the office." *Cf. Sydnor v. Fairfax County*, 681 F.3d 591, 593 (4th Cir. 2012) (observing that an EEOC filing "ensures that the employer is put on notice of the alleged violations" (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005))). Accepted as true, and viewed in Kelly's favor, these allegations suggest the Town knew of Kelly's disabilities at all relevant times. And as the Town had notice of Kelly's disabilities, this appeal turns on whether the January 2018 Letter adequately communicated his desire for an accommodation.

While the burden of requesting an accommodation is light, not every work-related request by a disabled employee constitutes a request

for accommodation under the ADA. Our sister circuits have held that while a request need not "formally invoke the magic words 'reasonable accommodation,' it nonetheless must make clear that the employee wants assistance for his or her disability." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1188 (10th Cir. 2016) (cleaned up); *Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002); *Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000); *see also Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997) (requiring "a causal relationship" between the disability and the putative request). The adequacy of a request depends on how a reasonable employer would view the employee's communication in the surrounding circumstances. *Kowitz v. Trinity Health*, 839 F.3d 742, 747–48 (8th Cir. 2016); *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) ("[C]ircumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation."). To properly invoke the ADA, the communication must be "sufficiently direct and specific," providing notice that the employee needs a "special accommodation" for a medical condition. *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) (quoting *Calero-Cerezo v. DOJ*, 355 F.3d 6, 23 (1st Cir. 2004)).

This is consistent with agency guidance on the ADA's accommodation provisions. The EEOC has opined that an employee seeking an accommodation "need not mention the ADA or use the phrase 'reasonable accommodation,'" but must inform his employer that the employee requires "an adjustment or change at work for a reason related to a medical condition." *EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act*, 2002 WL 31994335, at *4 (Oct. 17, 2002); *see also Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (holding that "[a]n employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment due to a medical condition." (cleaned up)).

These limitations enable employers to differentiate between protected requests for accommodation and everyday workplace grievances. As discussed above, to kickstart the interactive process, "the employee must make an adequate request, thereby putting the employer on notice." *Lashley*, 66 F.4th at 179 (quoting *Wilson*, 717 F.3d at 347). But an employee may seek changes to his working conditions for any number of reasons unrelated to a disability, such as "the kind of personality conflict that pervades many a workplace." *Ziskie v. Mineta*, 547 F.3d 220, 227 (4th Cir. 2008). Merely labelling a list of suggestions an "accommodation request" is not enough to inform the employer that the employee is requesting

> workplace changes to address his disabilities, rather than other, unrelated issues. Accordingly, just as an employee need not "formally invoke the magic words 'reasonable accommodation,'" *Foster*, 830 F.3d at 1188 (cleaned up), those magic words are not sufficient to trigger the employer's duty to pursue the ADA interactive process. Instead, to place the employer on notice, there must be a logical bridge connecting the employee's disability to the workplace changes he requests. Though this bridge need not be explicit in the accommodation request, the substance of the request must permit the employer to infer that the request relates to the employee's disability. The substance of the employee's communication, not its title, determines whether the ADA applies.

90 F.4th at 166-68.

Accordingly, the *Kelly* court concluded that the district court did not err in concluding that the letter was not an accommodation request because the letter "simply does not make clear that [Kelly] wants assistance for his [] disability." *Id.* at 168 (citation omitted). The plaintiff further argued that it was "immediately apparent" why his requests contained in the letter "would alleviate his anxiety, depression, and high blood pressure." *Id.* In response, the Fourth Circuit concluded "that alone does not change the substance of the letter or transform the letter into a request for accommodations." *Id.* (citing *Jacobs*, 780 F.3d at 581, holding that the employee must communicate a desire for an accommodation); and *C.R. Eng., Inc.*, 644 F.3d at 1049 (holding that a request must be "sufficiently direct and specific" (cleaned up)).

In the instant case, Plaintiff rests solely on her advisement of her doctor's note as evidence of her accommodation request protected activity. Viewed in the light most favorable to Plaintiff, the record before the court demonstrates that on January 16, 2019, Plaintiff received a note from her doctor that stated: "The patient is restricted to an 8 hour work day due to her pregnancy per physicians orders." (Pl.'s Resp., Doctors Notes Jan. 16, Exhibit H, ECF No. 82-8 at 3.) In answer to Defendant's Interrogatories, Plaintiff attests:

> About a week later, Viaud made a request that would require Parker to complete several additional tasks when she had already worked a

43

full day completing observations at the main hospital. Parker called Viaud and shared that she needed to limit her hours as a result of her pregnancy. Parker specifically informed Viaud that she had a doctor's note restricting her to an 8-hour day. In response, Viaud said that it didn't matter if Parker was pregnant because she was still a salaried employee and her pregnancy was "no excuse."

(Pl.'s Suppl. Answers to Def.'s Interrog. No. 15.)    Plaintiff testified at deposition to the same

effect:

> Q.    Do you recall this interaction?
>
> A.    Yes.
>
> Q.    Could you tell me what happened?
>
> A.    . . . This email also speaks to the amount of – I guess I could say expectations or requirements that was placed on me.  In the email, she does mention that JoDonna can pull the information. JoDonna, honestly, could have did the entire report, right?  And that was one thing that I did ask her, Well, can JoDonna do it? Because I'm doing observations; I'm training; I'm doing eighty million things, and there's only so many hours in a day. And actually this was around about the time we kind of had our conversation of me expressing to her – I don't want to say this is the exact date, but I'm almost certain that this conversation was based on – or this email or this tasking was based on me telling her that, you know, my doctor gave me a note.  I can only work the right hours.  This is becoming too much.  Because I had observations at the hospital that entire day. So I had to stop the observations, come talk to you, get on the shuttle, go home, drive from DC and get you this report.  It was just too much.

(Parker Dep. 104:17-19; 106:12-107:12.)  While Plaintiff maintains that she notified Viaud of her

doctor's note, Viaud testified that she has no recollection of Plaintiff informing her that she was

limited to an eight-hour work day.  (Viaud Dep. 158:19-159:3.)

Even assuming, however, that Plaintiff notified Viaud of her doctor's note, this alone is

insufficient to constitute a protected activity (by way of a request for accommodation under the

ADA), because Plaintiff has not produced evidence adequate to generate a triable issue as to

whether Plaintiff made clear that the workday limit was a request for disability accommodation. "To properly invoke the ADA, the communication must be sufficiently direct and specific, providing notice that the employee needs a special accommodation for a medical condition." *Kelly*, 90 F.4th at 167 (citation omitted).  It is also not entirely clear whether Plaintiff merely informed Viaud that she had a doctor's note or whether Plaintiff informed Viaud that she required an accommodation and "require[d] an adjustment or charge at work for a reason related to a medical condition."  *See Kelly, supra.*

Indeed, it was not until February 22, 2019, that Plaintiff submitted a formal request for accommodation with regard to her limited work hours.  (Accommodation Request, ECF No. 82-19.)  Plaintiff testified at deposition:

> Q.     Did you ever request a formal accommodation from Children's to be able to work from home?
>
> A.     I didn't request a formal accommodation to work from home; I requested a formal accommodation with regards to my hours. And I guess that would have translated to workload. I don't know if they translate to the same thing. But with regards to hours -- or hours being requested to work.
>
> Q.     And that was the eight hours?
>
> A.     Yes.
>
> Q.     And if we look at Exhibit 6, it's the doctor's note. We're going to flip to the next page. Let me see. This is 19, SPARKER19. It says: The patient is restricted to an eight-hour workday due to her pregnancy per physician's orders.
>
> A.     Yes.
>
> Q.     That's January 16th, right? It's faded into the header.
>
> A.     I want to say yes.
>
> Q.     So January at least?

A.      Okay. Yes.

Q.      Okay. And that's what you were referring to, right?

A.      Yes, ma'am.

Q.      And you submitted this letter to HR?

A.      It went directly to Hartford, I believe.

Q.      To Hartford?

A.      Yes.

Q.      Okay. Do you know if HR ever got a copy?

A.      I want to say I don't know because it's like they really -- I don't want to say they didn't have an HR department. It was almost like I had to call like a hotline number, and then she referred me to Hartford. So I basically described to the young lady what was going on, and then she referred me to an individual, and then they followed-up with everything.

(Parker Dep. 187:19-189:15.)

While it is undisputed that Plaintiff's formal accommodation request submitted to Hartford constitutes a protected activity, it is also undisputed that Viaud began the process of terminating Plaintiff's employment on January 29, 2019 – before Plaintiff submitted her formal accommodation request. (Viaud Termination Emails, ECF No. 82-11 at 8). Accordingly, Plaintiff cannot establish a causal link between the protected activity and the adverse action. *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

Because Plaintiff's action of notifying Viaud of her doctor's note is not an accommodation request, and Plaintiff submitted a formal accommodation request after Defendant began the process of terminating her employment, Plaintiff fails to provide sufficient evidence to prove a prima facie case of retaliation. Defendant is entitled to judgment as a matter of law as to Plaintiff's retaliation claims contained within Counts II and III.

46

**F.**     <u>**Legitimate, Non-Discriminatory Reasons and Pretext**</u>[13]

Even had Plaintiff established a prima case of discrimination or retaliation, Defendant has set forth legitimate, non-retaliatory reasons for terminating Plaintiff.  The record before the court demonstrates that Defendant has provided a "legitimate, non-retaliatory reason" for terminating Plaintiff, specifically, the thorough record of admissible evidence documenting Plaintiff's performance issues during the introductory period of employment.  *See Alexander v. Bloomingdale's, Inc.*, No. PWG-17-3283, 2019 WL 2162286, at *17 (D. Md. May 17, 2019), *aff'd*, 780 F. App'x 48 (4th Cir. 2019)2019 WL 2162286, at *17 (D. Md. May 17, 2019) (explaining that the defendant's evidence that it warned the plaintiff "repeatedly that her performance was dissatisfactory also establishes the employer's 'legitimate, non-retaliatory reason for her termination, namely, her well-documented performance issues'") (quoting *Myles-Anderson*, 2017 WL 881812, at *4)); *Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (explaining that "[j]ob performance and relative employee qualifications are widely recognized as a valid, non-discriminatory basis for any adverse employment decision") (citing *Burdine*, 450 U.S. at 258-79 and *Young v. Lehman*, 748 F.2d 194, 198 (4th Cir. 1984)).

According to Viaud's testimony, she became concerned with Plaintiff's work performance around November or December of 2018.  (Viaud Dep. 199:4-14.)  Specifically, Viaud testified:

> Q.     And do you recall the specific performance issue or issues that caused you to be concerned about her performance in November or December of 2018?
>
> A.     Specifically meeting deadlines and just submitting of

---

[13] As discussed earlier, "[u]nder the *McDonnell Douglas* scheme, as clarified in *Hicks*, once a prima facie case is established, the burden shifts to the employer to provide a legitimate nondiscriminatory explanation for the adverse employment action taken."  *Mitchell*, 12 F.3d at 1317.  "If the employer meets this burden, then the presumption created by the prima facie case is rebutted and simply 'drops out of the picture.'"  *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510 (1993)).  "The evidence, however, that was offered to establish the prima facie case remains in the case, together with any evidence presented to show that the employer's explanation was untrue or pretextual."  *Id.*

information or work that required multiple redos and additional work to be done. Just grammatic errors. Just, you know, limited knowledge on how to obtain resources. Just -- but mainly just the deadlines, the amount of revisions that her work required, the amount of rereviews even when the specific things that she was having some challenges with. Once, you know, I corrected them she would resubmit it and it still would be those same errors. So I just was really concerned about her ability to, just attention to detail, just the ability to be able to submit work on time with minimum errors. Or just, you know, not requiring multiple reviews because it was just taking more time.

Q.      Okay. You identified I believe one, two, three, four things. And then you kind of wrapped up and said mainly it was the deadline issue and the need for multiple revisions to her work. Is that, were those the main issues?

A.      I made mention about attention to detail.

Q.      And do you believe that that was contributing to the need for multiple revision to her work?

A.      The attention to detail, yes.

Q.      Is there a specific work product that you recall having to be revised multiple times?

A.      The PawPrint newsletter.

Q.      Anything else?

A.      During that time it was also the annual competency, like reporting. Like, there was information that was reported inaccurately. To be honest with you, it was really just a lot of her work in general that whatever she submitted either it was late or just required several reviews. There were several inquiries that were made to the AS training email that she would forward to me that I felt that she should already know as a training specialist. So I would have to answer the questions, and just felt like, you know, at this point that these were things that she should already know. And it was just, you know, causing me more work because I might as well just do it myself if I was taking, you know, the amount of revisions that were required. The amount of time that I was taking to answer the questions that she didn't know, or the follow-up that I would have to do on her work, I might as well have just done the work myself.

(Viaud Dep. 199:16-202:4.)   Further, Defendant offers admissible evidence that Plaintiff was terminated because her "work performance is not at a level consistent with the requirements of your job description, which are required to meet the needs of our department."  (ECF No. 63-7 at 72.)  Accordingly, Defendant has articulated a legitimate, non-retaliatory reason for termination of Plaintiff's employment.

Because Defendant has met its burden of production, "the burden shifts back to [Plaintiff] to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'"  *Hill*, 354 F.3d at 285 (quoting *Reeves*, 530 U.S. at 143); *see Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001) (explaining that "[o]nce an employer offers a legitimate, non-discriminatory explanation for the challenged employment decision, 'the plaintiff must than have an opportunity to prove . . . that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" (quoting *Burdine*, 450 U.S. at 253)).  "A plaintiff could accomplish this goal 'by showing that the employer's proffered explanation is unworthy of credence.'"  *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).

In *Holland.*, the Fourth Circuit explained:

> Accordingly, the burden to demonstrate pretext has "merg[ed] with the ultimate burden of persuading the court that [Holland] has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In *Reeves*, the Supreme Court clarified how a claimant can avoid summary judgment under the *McDonnell Douglas* framework. Once the question comes down to pretext, a plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). A plaintiff could accomplish this goal "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.

In *Reeves*, the company claimed that Reeves was fired because he had failed at his responsibility of recording worker attendance. Reeves, however, offered evidence that he properly maintained the attendance records. This evidence, the Supreme Court explained, combined with the strong evidence supporting Reeves's prima facie case, was enough to support a jury's verdict of liability. *Reeves*, 530 U.S. at 146. Thus, the Supreme Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148 (emphasis added). But the Supreme Court cautioned that this will not always be the case; for example, judgment as a matter of law may be appropriate if a "plaintiff created only a weak issue of fact as to whether the employer's reasons were untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Thus, a key factor for courts to consider is "the probative value of the proof that the employer's explanation is false." *Id.* at 149.

487 F.3d 208, 214-15 (4th Cir. 2007). Importantly, it is not the court's "province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse employment action]." *Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 722-23 (4th Cir. 2002) (internal quotations and citation omitted)). If the record demonstrates that Defendant "honestly believed" Plaintiff should be terminated, "then pretext is absent, even if Defendant[] [was] wrong or mistaken about the underlying facts." *Supinger v. Va.*, 259 F. Supp. 3d 419, 436 (W.D. Va. 2017) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217-18 (4th Cir. 2007)).

The court finds *Foster v. University of Md.-Eastern Shore* instructive. 787 F.3d 243 (4th Cir. 2015). There, the Fourth Circuit found that the plaintiff stated a prima facie case for retaliation and that the defendant proffered evidence of a legitimate, non-retaliatory reason for termination. *Id.* at 253. Thus, the court examined the pretext stage of the *McDonnell Douglas* inquiry:

The University claims to have fired Foster because she used too much leave time, was inflexible and unwilling to accommodate

50

changes to her schedule, and moved furniture and edited office forms without permission. Foster argues that the University's proffered non-retaliatory reasons are pretextual because: (i) Foster's immediate supervisor and the department scheduler both testified that Foster was not inflexible in scheduling; (ii) Wright testified that there was no documentation of Foster's supposed inflexibility in her personnel file; (iii) Foster's immediate supervisor testified that Foster had been given permission to edit the office forms and that Wright had initially praised her work; (iv) Foster's immediate supervisor repeatedly praised her work and discussed promoting her to corporal before she made her sexual harassment complaint; and (v) the University did not initially provide Foster with a reason for her termination.

787 F.3d 243, 253-54 (4th Cir. 2015).

The Fourth Circuit agreed with the district court that the plaintiff "render[ed] the employer's reasons so questionable as to raise an inference of deceit." *Id.* at 254. And therefore, a jury could conclude from the plaintiff's evidence that the proffered justifications for terminating her were not its real reasons. *Id.* Moreover, the court determined that a jury could conclude the defendant terminated the plaintiff in retaliation for her complaints of sexual harassment and subsequent complaints of ongoing retaliation. *Id.* Accordingly, the court found that summary judgment in favor of the defendant was not warranted on the plaintiff's retaliation claim. *Id.*

The precise issue is whether, based on the record before the court, there is evidence from which a factfinder could conclude that Defendant's "asserted justification is false," *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (citation omitted), and "that the alleged form of discrimination was the real reason." *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 525 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015). Plaintiff contends that she has provided evidence of contradictory statements by Viaud. Specifically, Plaintiff argues that, despite asserting poor performance as the reason for termination, Viaud wanted Plaintiff to continue working for six to eight more weeks. (ECF No. 82 at 19.) Plaintiff further contends that Defendant

originally stated that Plaintiff was terminated because new hires attending her classes were failing assessments.  (ECF No. 82 at 23.)  And then, Plaintiff argues, Defendant reasoned that the new hires were not being adequately prepared.  (ECF No. 82 at 23.)

Courts have found evidence of pretext when a defendant offers "different justification at different times" for the adverse action.  *Sears Roebuck and Co.*, 243 F.3d at 853; s*ee Dominguez– Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").  Importantly, however, "[w]here different, but not inconsistent reasons are offered, a finding of pretext is unwarranted." *Sanders v. Wal-Mart Supercenter of Aiken, SC*, No. JMC-14- 3509, 2016 WL 1156648, at *10 (D.S.C. Mar. 24, 2016) (citing authority), *aff'd sub nom. Sanders v. Wal-Mart Stores E., L.P.*, 686 F. App'x 240 (4th Cir. 2017); *see Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("[A] plaintiff cannot seek to expose [a] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.").

As discussed at length above, the record before the court contains strong evidence that Plaintiff was terminated due to her poor performance, and Plaintiff's counter-evidence does not demonstrate that Defendant's various articulated reasons for Plaintiff's termination are inconsistent with that basis, or false.  Moreover, "a plaintiff may not simply allege that the employer's stated reasons were inaccurate without also tethering (or enabling the court to tether) the employer's decision to the discriminatory reasons." *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 525 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015).  "Plaintiff must first

undercut or invalidate the employer's stated reasons and also establish through evidence or through

an inference that the improper discriminatory motivation was the real reason." *Id.* Plaintiff has

failed to achieve this.

Plaintiff contends that Defendant failed to abide the Corrective Action Policy, which

requires formal write-ups before termination. On this issue, the court finds *Fallin v. Mayor of

Baltimore* instructive. No. 1:19-CV-01500-JMC, 2021 WL 3725378 (D. Md. Aug. 23, 2021).

There, the plaintiff argued that the defendant's deviation from its own discipline policy was

evidence of pretext. *Id.* at *8. The court disagreed:

> Plaintiff has not cited, nor is this Court aware, of precedent within
> the Fourth Circuit that an employer's deviation from its own
> disciplinary policy is conclusive evidence of pretext. Plaintiff's
> citations to cases from other Circuits suggest only that this evidence
> "may give rise to inferences of pretext." *Goudeau v. Nat'l Oilwell
> Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) (emphasis added and
> citation omitted); *see also Lathram v. Snow*, 336 F.3d 1085, 1093
> (D.C. Cir. 2003) ("[U]nexplained [hiring] inconsistency can justify
> an inference of discriminatory motive."). Here, BCDOT provided a
> credible explanation, supported by the record, for its departure from
> the Lateness Policy—Plaintiff concealed her lateness by failing to
> alert Ms. McBeth and submitting fraudulent time sheets. Thus,
> BCDOT, could not discipline Plaintiff pursuant to the stated policy.
> Instead, upon discovering that Plaintiff had been absent more than
> thirteen times in a rolling one-year period, BCDOT terminated
> Plaintiff.

2021 WL 3725378, at *8.

In the instant case, like *Fallin*, Plaintiff does not cite authority that an employer's failure

to abide its internal discipline or corrective policy "is conclusive evidence of pretext." *See Fallin,

supra.* Further, Gonithellis testified that the Corrective Action Policy does not apply to an

employees' introductory period. (Def.'s Reply, Gonithellis Dep., Exhibit M, ECF No. 86-1 at

150:8-10.) Specifically, Gonithellis testified that the Corrective Action Policy did not apply to

Plaintiff:

Q.     Okay. The corrective action document you're referring to, is that known as a corrective action form?

A.     Correct.

Q.     Okay. And you're aware that there are no signed corrective action forms from Ms. Parker leading up to her termination.  Is that right?

A.     That's correct. She was in her introductory period, so there wouldn't have been any.

(Gonithellis Dep. 105:16-106:3.)  Plaintiff provides no evidence to rebut this or to suggest that the Corrective Action Policy applied to her.

While Plaintiff may not agree with Defendant's reasoning, in contrast to *Foster*, Plaintiff fails to provide evidence that Defendant's proffered reasons for terminating her employment (at the time) or that Defendant's asserted justification (here) is false.  *Foster*, 787 F.3d at 250. Moreover, as referenced above, the evidence presented by Plaintiff does not connect Defendant's decision to terminate Plaintiff to the alleged discriminatory reasons.

IV.    **CONCLUSION**

For the reasons set forth herein, by separate order, Defendant's Motion for Summary Judgment (ECF No. 63), is **GRANTED**.

/S/_____
Julie R. Rubin
United States District Judge

March 4, 2024